# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE WILLIAMS COMPANIES, INC., | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) C.A. No. 12168-VCG |
| | ) |
| ENERGY TRANSFER LP, formerly | ) |
| known as ENERGY TRANSFER | ) |
| EQUITY, L.P., and LE GP, LLC, | ) |
| | ) |
| Defendants and | ) |
| Counterclaim Plaintiffs. | ) |
| | ) |
| | ) |
| THE WILLIAMS COMPANIES, INC., | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) C.A. No. 12337-VCG |
| | ) |
| ENERGY TRANSFER LP, formerly | ) |
| known as ENERGY TRANSFER | ) |
| EQUITY, L.P., ENERGY TRANSFER | ) |
| CORP LP, ETE CORP GP, LLC, LE GP, | ) |
| LLC and ENERGY TRANSFER | ) |
| EQUITY GP, LLC, | ) |
| | ) |
| Defendants and | ) |
| Counterclaim Plaintiffs. | ) |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  March 4, 2020
Date Decided:  July 2, 2020

Kenneth Nachbar, Susan Waesco, Matthew Clark, and Zi-Xiang Shen, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Antony Ryan, Kevin Orsini, and Michael Addis, of CRAVATH, SWAINE & MOORE LLP, New York, New York, *Attorneys for Plaintiff and Counterclaim Defendant The Williams Companies, Inc.*

Rolin Bissel, James Yoch, Jr., and Benjamin Potts, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Michael Holmes, John Wander, Craig Zieminski, and Andy Jackson, of VINSON & ELKINS LLP, Dallas Texas, *Attorneys for Defendants and Counterclaim Plaintiffs Energy Transfer LP, formerly Energy Transfer Equity, L.P.; Energy Transfer Corp LP; ETE Corp GP, LLC; LE GP, LLC; and Energy Transfer Equity GP, LLC.*

GLASSCOCK, Vice Chancellor

This matter involves a failed merger between two fuel pipeline giants, Plaintiff/Counterclaim Defendant The Williams Companies, Inc. ("Williams") and Defendant/Counterclaim Plaintiff Energy Transfer LP ("ETE"). That merger, slated to close four years ago, foundered on the shoal of a declining energy market. ETE made no secret of the fact that it wanted to avoid the deal, and—as ETE tells it, at least—Williams saw the merger agreement primarily as an opportunity to leverage a settlement to consent to a breakup. Williams, however, sought specific performance of the merger agreement. Fortunately for ETE, the cash-plus-equity structure of the consideration together with the rapid decline in the value of ETE units (which fell in consort with the general energy industry decline) meant that its tax advisor could no longer certify that the merger would qualify as tax free. Since the parties had agreed in the merger agreement that such an opinion was a condition precedent to closing, I denied Williams' request to specifically enforce the merger agreement via closing, after an expedited proceeding, on June 24, 2016.[1] The failure of the merger was bruising to both sides, and they sought to dress their wounds with the balm of contractual damages; thus, this litigation proceeded. By a second

---

[1] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017).

Memorandum Opinion dated December 1, 2017, I dismissed in part ETE's counterclaim seeking a contractual breakup fee.[2]

Before me now are cross-motions for summary judgement concerning part of Williams' contractual damages claims. Williams, in order to enter the merger agreement with ETE, had to exit another transaction, which caused it to incur a cost of $410 million. Williams and ETE allocated the risk that this payment might prove valueless if the Williams-ETE merger failed to go through. They provided that, if either party terminated the merger for reasons including the passing of an outside date (which occurred here due to the failure of the tax-free condition), *and* ETE was not at that time in compliance with one of several other contractual mandates, ETE would reimburse Williams the $410 million. This Memorandum Opinion addresses whether ETE is liable for that reimbursement, under the record as it now exists. While I am not able to resolve all remaining issues without a trial record, I am able to address and clarify the contractual obligations of the parties, as I interpret the merger agreement. My reasoning is below.

---

[2] *Williams Cos., Inc. v. Energy Transfer Equity*, 2017 WL 5953513 (Del. Ch. Dec. 1, 2017) *reargument denied* 2018 WL 1791995 (Del. Ch. Apr. 16, 2018).

## I. BACKGROUND[3]

*A. The Parties*

Plaintiff and Counterclaim Defendant Williams is a Delaware corporation with headquarters in Tulsa, Oklahoma.[4]

Defendant and Counterclaim Plaintiff ETE, formerly known as Energy Transfer Equity, L.P., is a Delaware limited partnership with headquarters in Dallas, Texas.[5] Defendant and Counterclaim Plaintiff ETE Corp GP, LLC ("ETE Corp") is a Delaware limited liability company.[6] Defendant and Counterclaim Plaintiff LE GP, LLC ("LE GP") is a Delaware limited liability company and the general partner of ETE.[7] Defendant and Counterclaim Plaintiff Energy Transfer Equity GP, LLC ("ETE GP") is a Delaware limited liability company.[8] Defendant Energy Transfer Corp LP ("ETC") is a Delaware limited partnership taxable as a corporation.[9] ETC

---

[3] I recite the facts necessary to my decision of the cross-motions for summary judgment. A more complete recitation may be found in *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017). I draw the facts below from the evidence submitted under affidavit with the parties' papers. I also draw facts from the prior decision in this case, affirmed by the Delaware Supreme Court. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1174 (Del. 1995) (holding that factual findings uncontested in appeal become law of the case).

[4] *Williams*, 2016 WL 3576682, at *2.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at *1.

is the entity into which Williams planned to merge.[10] I refer to these Defendants and Counterclaim Plaintiffs collectively as "ETE."

*B. Factual Background*

1. Williams and ETE Agree to Merge

ETE offered to purchase Williams in an all-equity deal on May 19, 2015.[11] After four months of negotiations, the parties signed the Agreement and Plan of Merger (the "Merger Agreement").[12] The transaction the parties ultimately negotiated (the "Merger") included cash as well as equity components: the surviving company would own 57% of the limited partner interest of ETE; ETE would own the Williams assets and 19% of the surviving company's shares; and former Williams stockholders would "receive a right to consideration consisting of (1) ETC shares representing approximately 81% of the surviving entity; (2) $6.05 billion in cash; and (3) certain contingent consideration rights."[13]

As a condition to its offer, ETE required that Williams terminate a roll-up transaction to which Williams had committed with its master limited partnership,

---

[10] *Id.*

[11] *Id.*

[12] *Id.*; Transmittal Aff. of Matthew R. Clark in Support of Pl.'s and Countercl.-Def.'s Mot. for Partial Summ. J., D.I. 460 ("Clark Aff."), Ex. 1, Agreement and Plan of Merger dated as of September 28, 2015 ("Merger Agreement").

[13] *Williams*, 2016 WL 3576682, at *3. Getting to this final result required several complex steps aimed at achieving a tax-free transaction. The deal mechanics, not at issue here, are described in detail in *Williams*, 2016 WL 3576682, at *3–4.

4

Williams Partners, L.P. ("WPZ") on May 12, 2015.[14] Terminating that roll-up transaction required Williams to pay WPZ a $410 million termination fee.[15] Thus, as a part of the Merger Agreement, the parties negotiated that if either party terminated the Merger Agreement under certain conditions, ETE would reimburse Williams in the same amount Williams had paid to WPZ to extract itself from the roll-up transaction: $410 million (the "WPZ Termination Fee Reimbursement").[16]

### 2. The Market Declines and ETE Issues New Equity

In late 2015, shortly after the parties executed the Merger Agreement, the energy market "experienced a precipitous decline."[17] The decline made the Merger far less attractive to ETE, and it sought a way out.[18]

One effect ETE feared if the Merger had negative consequences was that it would have to cut distributions to maintain cash flow in order to prevent its credit rating from dropping.[19] Distributions to equity holders, however, are the *raison d'etre* of ETE's business model.[20] To resolve the issue, it proposed an offering of

---

[14] Clark Aff., Ex. 6, at -1680566.

[15] Clark Aff., Ex. 5, Agreement and Plan of merger dated as of May 12, 2015 by and among The Williams Companies, Inc., SCMS LLC, Williams Partners L.P., and WPZ GP LLC, § 7.6(a).

[16] Merger Agreement, § 5.06(f).

[17] *Williams*, 2016 WL 3576682, at *1.

[18] *Id.*

[19] *See* Clark Aff., Ex. 9, at -67801; Clark Aff., Ex. 11, Dep. of Thomas Long date Dec. 3, 2019, at 11:20–13:12.

[20] *See In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at *4 (Del. Ch. May 17, 2018) (discussing the Merger and noting the possibility of distribution cuts "spelled

convertible preferred units ("CPUs") to ETE unitholders, while excluding Williams' stockholders (the "Public Offering").[21] The holders of the CPUs would receive guaranteed but deferred distributions, allowing ETE to preserve cash. Williams informed ETE that it believed such an offering would violate certain operating covenants under the Merger Agreement, and that the offering therefore required Williams' consent.[22] Williams believed that the Public Offering would hurt Williams stockholders because it would allow ETE to cut common distributions to nothing while still permitting distributions to participating ETE unitholders.[23] As a result of this belief, the Williams board of directors declined to consent to the Public Offering.[24]

ETE then made a private offering of Series A Convertible Preferred Units (the "Preferred Offering") largely similar to the Public Offering that Williams had rejected, but which, in ETE's view, did not require Williams' consent.[25] The

---

trouble for ETE . . . ETE distributed all of its available cash to unitholders every quarter. Thus, ETE depended on access to capital markets to fund its growth. Because credit ratings determine access to credit and the cost of debt, it was particularly important for the ETE family of companies to maintain its ratings.").

[21] Clark Aff., Ex. 17.

[22] Clark Aff., Ex. 19, at -1697936.

[23] Clark Aff., Ex. 20, at -51439; Clark Aff., Ex. 10, Dep. of Garner dated Dec. 12, 2019, at 289:10–290:10; Clark Aff., Ex. 21, Dep. of Gary Posternack dated Oct. 24, 2019, at 115:6–17, 357:9–358:9.

[24] Clark Aff., Ex. 23, at -22330.

[25] *See* Clark Aff., Ex. 24.

maximum potential value of the Preferred Offering was $942,508,720.[26] ETE informed Williams of the Preferred Offering *after* it completed.[27] The Preferred Offering operated in the same way as the Public Offering, allowing participating ETE units to receive a guaranteed distribution, regardless of distributions to non-participating units.[28] This meant that following the Merger, ETE could potentially cut distributions to all common unitholders (including former Williams stockholders), while participating unitholders—the majority of whom were ETE insiders—would continue to receive guaranteed (but deferred) distributions.[29]

Before ETE signed the Merger Agreement, it had three classes of equity.[30] The Preferred Offering represented a fourth class of equity in addition to the three

---

[26] Transmittal Aff. of Benjamin M. Potts in Support of Defs.' and Countercl. Pls.' Opening Br. in Support of Mot. for Summ. J., D.I. 463 ("Potts Aff."), Ex. 8, Rebuttal Aff. of J.T. Atkins on Behalf of Energy Transfer Equity, LP, and LE GP, LLC, ¶¶ 23, 32; *see* Potts Aff., Ex. 21, at 2 (ETE Form 8-K dated March 8, 2016 summarizing issuance).

[27] Clark Aff., Ex. 25, Dep. of John W. McReynolds dated Oct. 8, 2019, at 191:11–15; Clark Aff., Ex. 26, Dep. of David A. Katz dated Oct. 29, 2019, at 67:9–17 ("Katz Dep."); Clark Aff., Ex. 18, Dep. of Donald Chappel dated Nov. 6, 2018, at 149:4–11.

[28] *See* Clark Aff., Ex. 24 (ETE Form 8-K dated March 8, 2016 describing Preferred Offering). The distribution was in the form of units, distribution of which would be deferred. An explanation of the operation of these rather complex securities can be found in *In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at *5–8 (Del. Ch. May 17, 2018) *aff'd sub nom. Levine v. Energy Transfer L.P.*, 223 A.3d 97 (Del. 2019).

[29] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *4 (Del. Ch. June 24, 2016) (describing ETE's intent to cut cash distributions to common unitholders due to the Merger and the effect of such a distribution cut); Clark Aff., Ex. 27, at 266–67 (ETE SEC Form S-4 noting participation by ETE's CEO, co-founder, and other insiders in the Preferred Offering).

[30] Merger Agreement, § 3.02(c)(i).

7

pre-existing classes.[31] Issuing the Preferred Offering necessitated ETE amending its limited partnership agreement.[32]

### 3. Williams' and ETE's Actions Prior to the Closing Date

Both Williams and ETE took actions prior to the Merger's expected closing date (the "Closing Date") that the other party describes as violations of the respective "reasonable best efforts" obligations to consummate the Merger. Among other things, the parties had conditioned closing on the receipt of an opinion from ETE's tax counsel, Latham & Watkins LLP ("Latham"), that the transaction would qualify for tax-free treatment under Section 721(a) of the Internal Revenue Code (the "721 Opinion").[33] After the market's decline reversed ETE's interests in the deal, ETE's Head of Tax, Brad Whitehurst, reviewed the transaction and began to think that it might not qualify for tax-free treatment.[34] Although at the time, no one else—

---

[31] Clark Aff., Ex. 45, Private Placement Memorandum, at -199834 (ETE Private Placement Memorandum filed with SEC representing that "Convertible Units will be a new class of units representing limited partner interests. . ."); Clark Aff., Ex. 46, Amendment No. 5 to Third Amended and Restated Agreement of Limited Partnership of Energy Transfer Equity, L.P., at 1 (Amendment to ETE's limited partnership agreement describing Preferred Offering as a "new class of units representing limited partner interest. . ."); Clark Aff., Ex. 47, Form 10-K, at F-7 through F-8 (ETE 2016 Form 10-K describing four classes of equity).

[32] *See* Clark Aff., Ex. 46, Amendment No. 5 to Third Amended and Restated Agreement of Limited Partnership of Energy Transfer Equity, L.P., at 1 (Amendment No. 5 to ETE's Third Amended and Restated Agreement of Limited partnership, adopted March 8); *Williams*, 2016 WL 3576682, at *4.

[33] Merger Agreement, § 6.01(h).

[34] *Williams*, 2016 WL 3576682, at *6.

8

including Latham and Williams' counsel—had advanced this view, Whitehurst brought the issue to Latham's attention.[35]

When it became apparent the issue was a real one that could potentially relieve ETE of its obligation to close, ETE made little to no effort to resolve it or find a workaround. After trial in 2016, I found that ETE "did not direct Latham to engage earlier or more fully with Williams' counsel, failed itself to negotiate the issue directly with Williams, failed to coordinate a response among the various players, went public with the information . . . and generally did not act like an enthusiastic partner in pursuit of consummation" of the Merger Agreement.[36]

Williams now offers new evidence in addition to that already established at trial in 2016 that suggests ETE's lack of effort. The evidence indicates a possibility that contrary to Whitehurst's testimony, one of his subordinates, Darryl Krebs, in fact uncovered the tax issue that ultimately led to the Merger's failure.[37] Krebs and Whitehurst's correspondence on the potential inability to close the Merger describes it as a "silver lining" and a possible "opportunity."[38] Additionally, attorneys at Wachtell, Lipton, Rosen & Katz ("Wachtell") who acted as ETE's deal counsel and

---

[35] *Id.*

[36] *Id.* at *17.

[37] Transmittal Aff. of Zi-Xiang Shen in Support of The Williams Companies, Inc.'s Br. in Opp'n to Defs.' and Countercl.-Pls.' Mot. for Summ. J., D.I. 479 ("Shen Aff."), Ex. 82, Dep. of Darryl A. Krebs dated Oct. 25, 2018, at 97:6–98:18, 100:7–102:8.

[38] Shen Aff., Ex. 83, at -294226.

advisors, expressed serious skepticism regarding Latham's recently-adopted position on the tax issue, but ETE never asked Wachtell to communicate with Latham or evaluate Williams' proposals to resolve the issue.[39]

For its part, ETE alleges that Williams' CEO, Alan Armstrong, attempted to extract *Williams* from the Merger, and that he took various obstructive actions toward that end. ETE alleges that Armstrong, without Williams' knowledge, fed inside information to a Williams stockholder, John Bumgarner, to assist with litigation attempting to enjoin the merger.[40] Bumgarner sued the parties in federal court in January 2016, asserting violations of the Securities and Exchange Act and seeking an injunction.[41] Armstrong never told the Williams board of directors about his alleged assistance to Bumgarner.[42] Two weeks prior to the 2016 trial in this Court, Armstrong deleted his personal email account that he used to communicate

---

[39] Shen Aff., Ex. 87, Dep. of T. Eiko Stange dated Oct. 26, 2018, at 105:22–106:6, 109:11–112:18, 120:6–23, 128:5–15 (Wachtell attorney testifying regarding his skepticism of Latham's perspective on the tax issue), 204:10–15 (testifying that ETE had not asked Wachtell to form an opinion on Latham's reasoning), 233:21–234:8 (testifying he was not asked to review Williams' proposals to resolve the issue); Shen Aff., Ex. 88, at -42729 (Internal Wachtell email date April 7, 2016 expressing skepticism of Latham's position).

[40] Transmittal Aff. of Benjamin M. Potts in Support of Defs.' and Countercl. Pls.' Response to Pl.'s Mot. for Partial Summ. J., D.I. 481 ("Potts Response Aff."), Ex. 2, Dep. of Meister dated Nov. 4, 2019 ("Meister Dep."), at 309:8–22, 327:17–23; Potts Response Aff., Ex. 3, Dep. of Laura Ann Sugg dated Nov. 22, 2019, at 36:23–37:7; Potts Response Aff., Ex. 4, Dep. of Alan Armstrong dated Oct. 24, 2019 ("Armstrong Dep."), at 186:22–187:3, 242:22–243:1, 270:16–24, 273:15–24.

[41] Potts Response Aff., Ex. 9, Class Action Compl., at ¶¶ 1, 46.

[42] Meister Dep, at 209:8–16, 327:17–23.

10

with Bumgarner.[43] Ultimately, Bumgarner's lawsuit was mooted when this Court permitted ETE to terminate the Merger.

In addition to Armstrong's actions with Bumgarner, ETE submits evidence that Armstrong initially withheld information about ETE's interest in acquiring Williams from the Williams' board, thus allowing it to enter the transaction with WPZ and commit to a substantial breakup fee without this knowledge.[44] ETE contends that Armstrong thus used the WPZ transaction as a form of "poison pill" against ETE's advances.[45] After the Williams board nonetheless determined to sign the Merger Agreement, Armstrong attempted to influence the board to find a way to terminate the agreement.[46] Using allies in management, he pushed for Williams' value as a standalone company.[47] Approaching the board approval vote, Armstrong continued to attempt to convince various directors to oppose the Merger.[48]

---

[43] Potts Response Aff., Ex. 36, Responses of Pl. the Williams Companies, Inc. to Defs.' First Set of Request for Admissions, at 8.

[44] Potts Response Aff., Ex. 41, Dep. of Mandelblatt dated Nov. 20, 2018 ("Mandelblatt Dep."), at 72:11–73:17; Meister Dep, at 141:20–142:7; *see* Potts Response Aff., Ex. 42, Minutes of a Special Meeting of the Board of Directors Held September 28, 2015, at -52994 (Williams board minutes showing absence of a discussion of the timing of ETE's solicitations).

[45] *See* Mandelblatt Dep., at 273:21–274:25, 322:6–14; Meister Dep., at 142:15–144:12.

[46] Potts Response Aff., Ex. 37, at -819862 through 63; Meister Dep., at 169:3–17; Potts Response Aff., Ex. 38, Dep. of Donald Chappel dated Nov. 6, 2018, at 88:8–17.

[47] Meister Dep., at 171:6–12; Potts Response Aff., Ex. 46, at -873387; Potts Response Aff., Ex. 37, at -819862 through 63.

[48] Potts Response Aff., Ex. 56, at -789293 through 94; Potts Response Aff., Ex. 93, at -795561.

Although the initial vote to enter the Merger Agreement had garnered a contested 8-5 approval, Williams' board issued a press release that it was "unanimously committed to completing the transaction with [ETE] per the merger agreement. . ."[49] ETE contends that Williams' strategy at this point was already to position itself for a breakup fee.[50] Some members of the Williams board questioned the Merger's value for Williams' stockholders, and Williams began to discuss the value of a breakup fee with its financial advisors.[51]

Williams took several other actions ETE contends were aimed at obstructing the Merger. It sued ETE's Chairman in Texas, alleging he engaged in self-dealing transactions.[52] When ETE approached it regarding the Public Offering, Williams declined to give its consent, thus ensuring the Public Offering could not be made.[53] ETE also alleges that Williams obstructed its efforts to talk with Williams' board or

---

[49] Potts Response Aff., Ex. 60, at -543388.

[50] *See* Potts Response Aff., Ex. 56, at -789293 through 94 (Armstrong writing that "some will claim that we should just hold the course, forcing [ETE founder] Kelcy to the alter [sic].").

[51] Potts Response Aff., Ex. 62, at -167054 (Williams director stating that "[b]enefits to shareholders [are] . . . now much diminished, if not gone."); *see* Potts Response Aff., Ex. 67, at -69170 through 71 (analysis prepared for Armstrong suggesting Merger was no longer valuable and valuing breakup fee); Potts Response Aff., Ex. 68, at -467599 (Williams advisor estimating potential breakup fee).

[52] Potts Response Aff., Ex. 69, Williams v. Warren, No. DC-1603941 (Apr. 6, 2016 Tex. Dist. Ct.).

[53] Potts Response Aff., Ex. 38, Dep. of Donald Chappel dated Nov. 6, 2018, at 217:7–218:5.

management about alternative financing resolutions to alleviate the tax issues that had arisen.[54]

### 4. ETE Terminates the Merger

On April 12, 2016, Latham informed Williams that it would likely be unable to deliver the 721 Opinion, which was, as described, a condition precedent to closing.[55] Williams attempted to work through the issue, suggesting alternatives to achieve tax-free status, and when these discussions failed, it filed suit in this Court to compel ETE to close under the Merger Agreement.[56]

On June 24, 2016, I declined to compel ETE to close, finding that it was "contractually entitled to terminate the Merger Agreement."[57] I concluded that Latham's inability to issue the 721 Opinion was in good faith, and that ETE did not contribute materially to Latham's inability to issue it.[58] I also found that neither party breached the "Tax Representation" clauses found in § 3.01(n)(i) and § 3.02(n)(i), meaning there were no facts regarding tax aspects of the transaction that

---

[54] *See* Potts Response Aff., Ex. 78, Minutes of a Telephonic Special meeting of the Board of Directors Held February 17, 2016, at -1944124 through 25.

[55] *See* Merger Agreement, § 6.01(h); Clark Aff., Ex. 30, at -196308 through 10.

[56] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *8 (Del. Ch. June 24, 2016); Clark Aff., Ex. 31, at -665882 through 83.

[57] *Williams*, 2016 WL 3576682, at *2, *21.

[58] *Id.* at *16 ("[T]he record is barren of any indication that the action or inaction of [ETE] (other than simply drawing Latham's attention to the problem) contributed materially to Latham's inability to issue the 721 Opinion.").

either party had failed to disclose.[59] These findings were later affirmed by the Supreme Court.[60] However, the Supreme Court disagreed with my analysis of ETE's best efforts, writing, "covenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction."[61] The Supreme Court found the language in the best efforts covenants "not only prohibited the parties from preventing the merger, but obligated the parties to take all reasonable actions to complete the merger."[62] The Supreme Court stated that a focus on the *absence* of affirmative Merger-scuttling acts by ETE was in error and noted that "[t]here was evidence, recognized by the Court of Chancery, from which it could have concluded that ETE did breach its [efforts] covenants. . ."[63] This issue was not case dispositive, however, and so the Court affirmed.

On, June 27, 2016, the Williams stockholders voted in support of the Merger.[64] That same day, Latham sent ETE "an execution version of the tax officer's certificate to support the [721 Opinion]," and Whitehurst informed Latham, "I have reviewed the revised officer's certificate and I continue to be unable to sign

---

[59] *Id.* at *18–19.

[60] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 268 (Del. 2017).

[61] *Id.* at 272.

[62] *Id.* at 273.

[63] *Id.*

[64] Clark Aff., Ex. 38, at 2.

the officer's certificate as drafted."[65]  The day after that, June 28, was the Closing Date.[66]  Williams attempted to close the transaction on the Closing Date, but ETE refused, relying on the absence of Latham's 721 Opinion, a condition precedent under the Merger Agreement.[67]  Latham reaffirmed that it could not deliver the 721 Opinion at that time.[68]  ETE terminated the Merger Agreement on June 29, after the Outside Date provided in the Merger Agreement.[69]  ETE's CEO confirmed that in terminating the Merger Agreement, ETE relied solely on Latham's inability to deliver the 721 Opinion.[70]  Williams wrote a letter to ETE, stating that it had been willing to waive conditions set forth in § 6.03(a)-(b) in the Merger Agreement and proceed with closing, but that it would now pursue the WPZ Termination Fee Reimbursement.[71]

### 5. Termination Clauses and Fees in the Merger Agreement

As noted, the parties agreed that ETE would pay Williams the WPZ Termination Fee Reimbursement if either party terminated the Merger Agreement

---

[65] Clark Aff., Ex. 71, at -87794.

[66] Clark Aff., Ex. 39, at -1174715; *see also* Merger Agreement, § 1.02.

[67] Clark Aff., Ex. 40, Declaration of Richard Hall, ¶¶ 3–4; Clark Aff., Ex. 41, at -1002872.

[68] Clark Aff., Ex. 42, at -290751 through 52.

[69] Clark Aff., Ex. 44, at -87881 through 82.

[70] Clark Aff., Ex. 15, Dep. of Kelcy Warren dated Dec. 4, 2019, at 104:21–22.

[71] Potts Aff., Ex. 24 (Letter from Williams General Counsel stating, "Williams was prepared yesterday to waive the failure of the conditions in Sections 6.03(a) and 6.03(b) and close, but in light of ETE's refusal to close and subsequent termination, Williams is now entitled to receive the WPZ Termination Fee Reimbursement.").

under certain circumstances. In the Merger Agreement provisions that follow, "Company" means Williams, "Parent" means ETE, and "TopCo" means ETC.[72]

Specifically, § 5.06(f) of the Merger Agreement states:

> If the Company or Parent terminates this Agreement pursuant to (A) Section 7.01(b)(ii), (B) Section 7.01(d), or (C) Section 7.01(b)(i) and, at the time of any such termination pursuant to this clause (C) any condition set forth in Section 6.01(b), 6.01(c), 6.01(d), 6.01(e), 6.03(a) or 6.03(b) shall not have been satisfied, then, in each case, Parent shall reimburse the Company for $410.0 million (the "WPZ Termination Fee Reimbursement"). . .[73]

Section 7.01(b)(i)—one of the possibilities listed above for termination that triggers the obligation set out in § 5.06(f)—provides:

> This Agreement may be terminated at any time prior to the Effective Time, whether before or after receipt of the Company Stockholder Approval, by delivery of written notice to the other parties hereto under the following circumstances . . . (b) by either of Parent or the Company (i) if the Merger shall not have been consummated on or before the date that is nine months after the date of this Agreement (as it may be extended from time to time by the mutual written agreement of Parent and the Company, the "Outside Date") . . . provided . . . however, that the right to terminate this Agreement pursuant to this Section 7.01(b)(i) shall not be available to any party if the failure of such party (and in the case of Parent, TopCo) to perform any of its obligations under this Agreement has been a principal cause of or resulted in the failure of the Merger to be consummated on or before such date[.][74]

---

[72] Merger Agreement, *Recitals*.

[73] *Id.*, § 5.06(f).

[74] *Id.*, § 7.01(b)(i).

The parties do not dispute that ETE terminated the Merger Agreement under § 7.01(b)(i) because the defined "Outside Date," June 28, 2016, passed without the Merger having consummated.[75]

### 6. ETE's Representations and Covenants in the Merger Agreement

In the Merger Agreement, ETE made several contractual representations and operating covenants that are now at issue in these cross-motions for summary judgment.

### a. Ordinary Course of Business Operating Covenants

ETE represented it would carry on in the ordinary course of business, which entailed several specific "ordinary course" covenants, discussed below. Under § 6.03(b) of the Merger Agreement, ETE agreed that:

> Each of TopCo and Parent shall have, in all material respects, performed or complied with all obligations required by the time of the Closing to be performed or complied with by it under this Agreement, and the Company shall have received a certificate signed on behalf of Parent by the chief executive officer or the chief financial officer of Parent to such effect.[76]

These performance obligations described in § 6.03(b) required ETE to abide by several further, specific operating covenants under § 4.01(b). ETE represented, first of all, that it would carry on its business "in the ordinary course":

---

[75] As described above, I found in 2016 that ETE had no obligation to close the merger by the Outside Date because the condition precedent to closing described in § 6.01(h)—Latham's 721 Opinion—had not been met.

[76] Merger Agreement, § 6.03(b).

Except as set forth in <u>Section 4.01(b)</u> of the Parent Disclosure Letter, expressly permitted by this Agreement, required by applicable Law or consented to in writing by the Company (such consent not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement to the Effective Time, Parent shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course and shall use commercially reasonable efforts to preserve substantially intact its current business organizations, maintain its rights, franchises and Parent Permits and to preserve its relationship with significant customers and suppliers. . . .[77]

Carrying on "its business in the ordinary course," in turn, entailed several specific restrictions. *First*, ETE represented that it would not take any actions resulting in new restrictions in the form of distributions and payments of dividends:

[D]uring the period from the date of this Agreement to the Effective Time, Parent shall not, and shall not permit any of its Subsidiaries to . . . (ii) take any action that would result in Parent or any of its Subsidiaries becoming subject to any restriction not in existence on the date hereof with respect to the payment of distributions or dividends[.][78]

*Second*, ETE represented that it would refrain from certain actions regarding manipulation of its equity securities:

[D]uring the period from the date of this Agreement to the Effective Time, Parent shall not, and shall not permit any of its Subsidiaries to . . . (iii) split, combine or reclassify any of its equity securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for equity securities, other than transactions by a wholly owned Subsidiary of Parent which remains a wholly owned Subsidiary after consummation of such transaction[.][79]

---

[77] *Id.*, § 4.01(b).

[78] *Id.*, § 4.01(b)(ii).

[79] *Id.*, § 4.01(b)(iii).

*Third*, ETE represented it would not amend its organizational documents:

[D]uring the period from the date of this Agreement to the Effective Time, Parent shall not, and shall not permit any of its Subsidiaries to . . . (vi) amend (A) the organizational documents of TopCo, (B) the Parent Certificate of Partnership or the Partnership Agreement (other than the Parent Partnership Agreement Amendment) or (C) the comparable organizational documents of any Subsidiary of Parent in any material respect[.][80]

### b. Capital Structure Representations

ETE made certain representations regarding its capital structure. In § 6.03(a)(i), ETE agreed:

The obligation of the Company to effect the Merger is further subject to the satisfaction or (to the extent permitted by Law) waiver at or prior to the Effective Time of the following conditions: . . . (a)(i) The representations and warranties of TopCo and Parent set forth in Sections 3.02(c)(i) and 3.02(c)(ii) (Capital Structure) shall be true and correct as of the Closing Date as though made on such date (except to the extent any of such representations and warranties speak as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), except for any immaterial inaccuracies. . . .[81]

Under § 3.02(c)(i), ETE represented that it had three classes of equity:

(c) Capital Structure. (i) The authorized equity interests of Parent consist of common units representing limited partner interests in Parent ("Parent Common Units"), Class D Units representing limited partner interests in Parent ("Parent Class D Units") and a general partner interest in Parent ("Parent General Partner Interest"). At the close of business on September 25, 2015 (the "Parent Capitalization Date"), (i) 1,044,764,836 Parent Common Units were issued and outstanding, of

---

[80] *Id.*, § 4.01(b)(vi).

[81] *Id.*, §6.03(a)(i).

which 5,776,462 consisted of Parent Restricted Units, (ii) 2,156,000 Parent Class D Units were issued and outstanding and (iii) there was an approximate 0.2576% Parent General Partner Interest. Except as set forth above, at the close of business on the Parent Capitalization Date, no equity securities or other voting securities of Parent were issued or outstanding. Since the Parent Capitalization Date to the date of this Agreement, (x) there have been no issuances by Parent of equity securities or other voting securities of Parent, other than the conversion of Parent Class D units outstanding as of the Parent Capitalization Date and (y) there have been no issuances by Parent of options, warrants, other rights to acquire equity securities of Parent or other rights that give the holder thereof any economic interest of a nature accruing to the holders of Parent Common Units.[82]

### c. Tax Representations

ETE made certain representations regarding tax matters in the Merger Agreement. Section 6.03(a)(iv) set out certain specific materiality limitations that would govern representations under that section:

> each of the other representations and warranties of TopCo and Parent set forth in this Agreement shall be true and correct (disregarding all qualifications or limitations as to "materiality", Parent Material Adverse Effect" and words of similar import set forth therein) as of the Closing Date as though made on such date . . . except, solely in the case of this clause (iv), where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect. The Company shall have received a certificate signed on behalf of Parent by the chief executive officer or the chief financial officer of Parent to such effect.[83]

---

[82] *Id.*, § 3.02(c)(i).

[83] *Id.*, §6.03(a)(iv).

One of the representations that came under the provision above was certain representations that ETE made in § 3.02(n)(i) regarding tax matters related to the transaction:

> None of TopCo, Parent or any Subsidiaries of Parent has taken or agreed to take any action or knows of the existence of any fact that would reasonably be expected to prevent (A) the Merger from qualifying for the Intended Tax Treatment or (B) the Contribution and Parent Class E Issuance from qualifying as an exchange to which Section 721(a) of the Code applies.[84]

### d. Best Efforts Covenants

The parties also represented that they would use best efforts to consummate the Merger. As described above, § 6.03(b) required ETE to have "in all material respects, performed or complied with all obligations required by the time of the Closing to be performed or complied with by it under this Agreement."[85] One of these requirements, found in § 5.03, was to use "reasonable best efforts" to consummate the transaction "in the most expeditious manner practicable":

> Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto shall use its reasonable best efforts to, and shall cause their respective Affiliates to use reasonable best efforts to, take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transactions, including using reasonable best efforts to accomplish the following: (i)

---

[84] *Id.*, § 3.02(n)(i).

[85] *Id.*, § 6.03(b).

the taking of all acts necessary to cause the conditions to Closing to be satisfied as promptly as practicable. . . .[86]

This requirement also encompassed several specific best efforts, among them qualification for tax-free treatment in § 5.07(a)(ii):

The Company, TopCo and Parent shall cooperate and each use its commercially reasonable efforts to cause (i) the Merger to qualify for the Intended Tax Treatment . . .[87]

### 7. The Parent Disclosure Letter and the Company Disclosure Letter

The Parent Disclosure Letter and the Company Disclosure Letter were incorporated into the Merger Agreement by reference.[88] These disclosure letters, among other things, enumerated carve-outs to the representations and covenants made in the Merger Agreement, permitting the parties to take certain actions that might otherwise be prohibited. Pertinent here, § 4.01(b)(v)(1) of the Parent Disclosure Letter permitted ETE to issue equity while the Merger was pending: "[ETE] may make issuances of equity securities with a value of up to $1.0 billion in the aggregate."[89]

---

[86] *Id.*, § 5.03(a).

[87] *Id.*, § 5.07(a)(ii).

[88] *Id.*, § 8.07(a) ("This Agreement (including the Company Disclosure Letter and the Parent Disclosure Letter and all other exhibits and schedules hereto), the Confidentiality Agreement and the CCR Agreement constitute the entire agreement. . .").

[89] Potts Aff., Ex. 2, Parent Disclosure Letter for Agreement and Plan of Merger ("Parent Disclosure Letter"), § 4.01(b)(v)(1).

## II. PROCEDURAL HISTORY AND CLAIMS

### A. *Procedural History*

Williams filed its original complaint seeking specific performance of the Merger Agreement on April 6, 2016.[90] ETE filed counterclaims.[91] I held a two-day trial in June 2016 and issued a post-trial Memorandum Opinion denying Williams' request to enjoin ETE from terminating the Merger.[92] Williams appealed.[93] The Supreme Court affirmed the decision on March 23, 2017.[94]

Meanwhile, Williams and ETE filed amended claims and counterclaims.[95] On December 1, 2017, I granted in part Williams' Motion to Dismiss ETE's counterclaims, foreclosing ETE's efforts to obtain a breakup fee as a result of the Merger it had terminated.[96] I then denied ETE's Motion for Reargument of that decision.[97] The parties proceeded on the remaining claims, centered largely on Williams' right to the WPZ Termination Fee Reimbursement. The parties filed

---

[90] Verified Compl. Seeking Specific Performance and Other Relief, D.I. 1.

[91] Defs.' Answer, Affirmative Defenses, and Original Verified Countercl., D.I. 58.

[92] Mem. Op. and Order, D.I. 185.

[93] Notice of Appeal to Supreme Court, D.I. 191.

[94] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264 (Del. 2017).

[95] Verified Am. Compl., D.I. 215 ("Am. Compl."); Defs.' and Countercl. Pls.' Sec. Am. and Suppl. Affirmative Defenses and Verified Countercl., D.I. 219 ("Am. Countercl.").

[96] Mem. Op., D.I. 288.

[97] Letter Op. and Order, D.I. 321.

cross-motions for summary judgment on January 14, 2020.[98] I heard argument on March 5, 2020, and I considered the matter fully submitted at that time.[99] After the motions were fully submitted, ETE filed a Motion for Sanctions on May 20, 2020.[100]

### B. The Parties Claims and the Cross Motions for Summary Judgement

In its Amended Complaint, Williams brings two counts for breach of contract against ETE. Count I relates to ETE's actions regarding the termination of the Merger: Williams alleges that ETE failed to use best efforts as required under § 5.03 and § 5.07 of the Merger Agreement to close the Merger.[101] Under Count I, Williams seeks damages arising from the deprivation "of the benefits of the Transaction" in "an amount to be proved at trial."[102] Williams has not moved for summary judgment on Count I, but ETE has moved for summary judgment on Count I. In Count II, Williams alleges that ETE was in breach of the Merger Agreement as of the Closing Date, entitling Williams to the WPZ Termination Fee Reimbursement under § 5.06(f).[103] The parties have cross-moved for summary judgment of Count II.

---

[98] Pl.'s and Countercl.-Def.'s Mot. for Partial Summ. J., D.I. 460; Defs.' and Countercl. Pls.' Mot. for Summ. J., D.I. 464.

[99] D.I. 495.

[100] Defs.' and Countercl. Pls.' Mot. for Sanctions or, Alternatively, an Evidentiary Hr'g on Spoliation of Evid., D.I. 503.

[101] Am. Compl., ¶¶ 216–32.

[102] *Id.* ¶ 231.

[103] *Id.* ¶¶ 233–52.

24

ETE filed its amended counterclaim and affirmative defenses ("Amended Counterclaim"), also containing two counts, on September 23, 2016.[104] In Count I, ETE seeks declaratory judgments under 10 *Del. C.* § 6501 regarding the parties' actions in the Merger.[105] In Count II, ETE alleges breach of contract against Williams.[106] I dismissed or struck parts of the Amended Counterclaim and issued a final judgment on November 14, 2018.[107] The chief effect was to deny ETE's counterclaims supporting its sought-after $1.48 billion termination fee.[108] In ETE's remaining counterclaims, it alleges breach of contract and seeks declaratory judgment for the following: that Williams breached the Merger Agreement (1) by failing to use its best efforts to consummate the transaction; (2) by withholding its consent from the Public Offering; and (3) by refusing to reasonably cooperate with ETE's requests to find financing solutions.[109] ETE does not seek summary judgment on its counterclaims. Thus, the cross-motions for summary judgment are largely a contest over whether Williams has a right as a matter of law to the WPZ Termination Fee Reimbursement.

---

[104] Am. Countercl.

[105] *Id.* ¶¶ 191–96.

[106] *Id.* ¶¶ 197–203.

[107] Order Granting in Part and Denying in Part Williams' Mot. to Dismiss and Strike, D.I. 399.

[108] *See id.*

[109] *See id.*

## III. ANALYSIS

Summary judgment may be granted if there is "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law."[110] The Court "must view the evidence in the light most favorable to the non-moving party."[111] The Court must not weigh evidence and instead must "determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party."[112] This requires the non-moving party to "set[] forth specific facts demonstrating that there is a genuine issue for trial."[113] Where the parties file cross-motions for summary judgment and "have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[114] Nonetheless, there is no right to summary judgment; the court in its discretion may determine that a trial record is necessary in the interests of justice.[115]

---

[110] Ct. Ch. R. 56(c).

[111] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2017 WL 3168966, at *2 (Del. Ch. July 26, 2017) (quoting *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660, at *2 (Del. Ch. Oct. 9, 1998)).

[112] *Id.* (quoting *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014)).

[113] *Klig v. Deloitte LLP*, 36 A.3d 785, 793 (Del. Ch. 2011).

[114] Ct. Ch. R. 56(h).

[115] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002); *El Paso Pipeline*, 2014 WL 2768782, at *9.

Contract interpretation is often amenable to summary judgment because "the interpretation of a contract is a question of law."[116]  Generally, only in ambiguous contracts where the contractual language is "fairly susceptible [to] different interpretation[s]" is summary judgment improper.[117]  However, "the intent of the parties as to [the contract's] scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[118]

Because the cross-motions for summary judgment here concern the same Merger Agreement provisions, I address both motions at once except where noted. Although the parties dispute each alleged breach separately, ETE raises two overarching arguments that Williams' claims are entirely foreclosed as a matter of law.  I address these first before proceeding to the specific alleged breaches.

*A. The Merger Agreement Permits Williams the Opportunity to Recover the WPZ Termination Fee Reimbursement Even Though ETE Validly Terminated the Merger for Failure of the 721 Opinion*

ETE's first overarching argument is that the contractual scheme in the Merger Agreement forecloses any recovery for Williams because the Merger terminated as a result of Latham's inability to issue the 721 Opinion, *not* from any of the alleged

---

[116] *Deloitte LLP v. Glanagan*, 2009 WL 5200657, at *5 (Del. Ch. Dec. 29, 2009).

[117] *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Mar. 6, 2017) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)).

[118] *Id.* (quoting *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 336 (Del. 2012)).

breaches at issue here.[119] As with any highly negotiated transaction, the parties allocated risks in the Merger Agreement. To enter the transaction with ETE, Williams first needed to extract itself from a different transaction with WPZ.[120] That extraction required paying WPZ a $410 million termination fee.[121] To compensate for this risk, the parties negotiated that if *either* party terminated the Merger under certain circumstances, then ETE would reimburse Williams that $410 million termination fee.

Section 5.06(f) describes the circumstances in which ETE must reimburse Williams the WPZ Termination Fee Reimbursement:

> If the Company or Parent terminates this Agreement pursuant to (A) Section 7.01(b)(ii), (B) Section 7.01(d), or (C) Section 7.01(b)(i) and, at the time of any such termination pursuant to this clause (C) any condition set forth in Section 6.01(b), 6.01(c), 6.01(d), 6.01(e), 6.03(a) or 6.03(b) shall not have been satisfied, then, in each case, Parent shall reimburse the Company for $410.0 million (the "WPZ Termination Fee Reimbursement"). . .[122]

The parties agree that ETE terminated the Merger Agreement under § 7.01(b)(i) due to the passing of the Outside Date. Sections 6.03(a) and 6.03(b)—which set forth the conditions Williams alleges ETE breached—describe various representations

---

[119] Defs.' and Countercl. Pls.' Opening Br. In Support of Their Mot. for Summ. J., D.I. 462 ("ETE Opening Br."), at 11–13.

[120] Clark Aff., Ex. 6, at -1680566.

[121] Clark Aff., Ex. 5, § 7.6(a).

[122] Merger Agreement, § 5.06(f).

and operating covenants that Williams claims ETE was in breach of at the time of termination.

The language of § 5.06(f) is unambiguous and provides clear instructions: *if* either party terminates due to, among other reasons, the passing of the Outside Date, *and* when this happens, various conditions are unmet, then ETE must reimburse Williams $410 million. The language provides a simple formula: has a party terminated pursuant to §§ 7.01(b)(ii), 7.01(d), or 7.01(b)(i)? If yes, do any of several "conditions" remain unsatisfied? If yes, ETE must pay Williams $410 million. Section 5.06(f) contains no causal language that suggests that to trigger the WPZ Termination Fee Reimbursement, the termination must result from the unsatisfied condition. By contrast, other termination fees in the Merger Agreement *do* contain causal language, suggesting its absence here is intentional.[123] Thus, a plain reading of § 5.06(f), based on the facts here, is as follows: ETE terminated the Merger Agreement under § 7.01(b)(i) due to the passing of the Outside Date; if at the time

---

[123] *See id.* § 5.06(d)(ii) (permitting ETE to recover a $1.4 billion termination fee if "this Agreement is terminated . . . *as a result of* [Williams'] breach of its obligations. . ."). ETE unsuccessfully pursued this $1.4 billion termination fee in its counterclaims. *See Williams Cos., Inc. v. Energy Transfer Equity*, 2017 WL 5953513 (Del. Ch. Dec. 1, 2017) *reargument denied* 2018 WL 1791995 (Del. Ch. Apr. 16, 2018). One principle of contract interpretation in Delaware is that the use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings. *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010).

it did so, it had not satisfied conditions set forth in § 6.03(a)-(b), then it must reimburse Williams the WPZ Termination Fee Reimbursement.[124]

ETE nonetheless argues, for two reasons, that this is not so.

*First*, ETE argues that the exclusion of § 6.01(h) (the 721 Opinion condition precedent) from § 5.06(f) shows that the parties were not allocating the reimbursement risk to ETE if—as happened—the lack of the 721 Opinion ultimately proved the Merger's undoing.[125] In other words, ETE argues that because the Merger's termination did not *result from* the failure of one of the sections listed in § 5.06(f), Williams is not entitled to collect the WPZ Termination Fee Reimbursement.[126] It argues that Williams is "attempt[ing] to collect a Termination Fee based on purported breaches that had nothing to do with the termination of the Merger Agreement."[127] ETE argues that the inclusion of four conditions precedent, §§ 6.01(b)-(e) (each having to do with regulatory approval) and the exclusion of four other conditions precedent demonstrates the risk allocation scheme. According to ETE, the WPZ Termination Fee Reimbursement is only triggered if the failure of something listed in § 5.06(f) *itself* unraveled the Merger. Such an argument ignores

---

[124] *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning." (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006))).

[125] ETE Opening Br., at 12–13.

[126] *Id.*

[127] *Id.* at 13.

30

the plain text, which here is unambiguous and therefore must control. Nowhere does § 5.06(f) connect the cause of the termination to the failure to satisfy the other conditions that trigger the WPZ Termination Fee Reimbursement. The only requirement is that the Merger is terminated "pursuant to . . . <u>Section 7.01(b)(i)</u>," which undisputedly occurred. Therefore, if "at the time of any such termination" a condition enumerated in any of §§ 6.01(b)-(e) or §§ 6.03(a)-(b) was not satisfied, ETE owes the WPZ Termination Fee Reimbursement. ETE's preferred construction—a preference arising I assume from a potential $410 million liability— would require a rewriting of the contract for which the parties bargained. This I may not do.[128]

*Second*, ETE argues that Latham's inability to issue the 721 Opinion excuses it from any further performance of any part of the Merger Agreement because "[t]he failure of a condition precedent excuses a party from its remaining obligations under a contract."[129] Thus, according to ETE, because its obligation to "effect the Merger" was "subject to the satisfaction" of the 721 Opinion under § 6.01(h), when the 721

---

[128] ETE has not sought reformation of the Merger Agreement. *See Am Gen. Hldgs. LLC v. The Renco Grp., Inc.*, 2020 WL 3484069, at *5 (Del. Ch. June 26, 2020) ("[T]o the extent this distinction represents a 'bad deal' for [defendant], it must be remembered that Delaware courts 'will not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts; the law enforces both.'" (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010))).

[129] ETE Opening Br., at 13 (citing *REJV5 AWH Orlando, LLC v. AWH Orlando Member, LLC*, 2018 WL 1109650, at *3 n.22 (Del. Ch. Feb. 28, 2018); 13 Williston on Contracts § 39:4 (4th ed. 1990)).

Opinion failed to appear, this "extinguished ETE's conditional obligations to perform *any further task or requirement* related to the conclusion of the Merger. . . ."[130]

As I understand ETE's argument, it is thus: Latham was unable to provide the 721 Opinion as of closing, a condition precedent. As a result, ETE was able to terminate the Merger Agreement, which it did. At that point, the trigger conditions in § 5.06(f)—those set forth in §§ 6.01(b), (c), (d), (e) and §§ 6.03(a) and (b)—were no longer conditions binding on ETE; all its obligations fell away due to the failure of the condition precedent, the Latham tax opinion, as a matter of law. Thus, there is nothing left to trigger the WPZ Termination Fee Reimbursement.

ETE's argument ignores the survival clause in § 7.02. Under that provision, the parties agreed:

> In the event of termination of this Agreement . . . this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of TopCo, Parent or the Company, other than the provisions of . . . [several Sections, including] Section 5.06 . . . which provisions shall survive such termination.[131]

Latham's inability to provide the 721 Opinion relieved ETE of the "obligation . . . to effect the Merger."[132] It was, therefore, permitted to terminate after the passing

---

[130] *Id.* at 14 (emphasis added).

[131] Merger Agreement, § 7.02.

[132] Id. § 6.01.

32

of the Closing Date. The parties agreed in § 7.02, however, that "any liability and obligation" provided in § 5.06(f)[133]—that is, the WPZ Termination Fee Reimbursement—would survive termination.[134] For the WPZ Termination Fee Reimbursement to survive requires reference to the underlying conditions that trigger that fee. To say that those enumerated conditions became a null set because they were extinguished by the termination would be oxymoronic, and inconsistent with a plain reading of the Merger Agreement as a whole. That is because the benefits of § 5.06(f) would be illusory if (as ETE argues) the termination, or the failure of the condition that permitted the termination, *relieved ETE of all the conditions that could trigger the WPZ Termination Fee Reimbursement*.[135] In interpreting the contract, I must harmonize its parts, including § 5.06(f), § 7.01(b)(i) and § 7.02.[136] I reject ETE's argument that the Merger's legitimate failure to close "extinguished" all its obligations, including those referenced in § 5.06(f).[137]

---

[133] Among other sections.

[134] Merger Agreement, § 7.02.

[135] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 n.21 (Del. 2010) (citing *Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994)) ("In placing a construction on a written instrument, reasonable rather than unreasonable interpretations are favored by law. Results which vitiate the purpose or reduce terms of the contract to an absurdity should be avoided.").

[136] *See Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) ("It is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.").

[137] I also note that the failure of the 721 Opinion under § 6.01(h) relieved *both* parties of the obligation to close. Thus, under ETE's argument, Williams was relieved of *its* "obligation to perform any further task or requirement related to the conclusion of the Merger." ETE Opening

33

In sum, I find the language in § 5.06(f) unambiguous, and that the obligations it imposes survive termination. ETE terminated the Merger Agreement under § 7.01(b)(i). If, as Williams alleges, ETE failed to satisfy its material obligations under a condition enumerated in any of §§ 6.01(b)-(e) or §§ 6.03(a)-(b), then, subject to affirmative defenses, it is obliged to pay Williams the WPZ Termination Fee Reimbursement. The pertinent question therefore becomes whether it failed to satisfy any of these conditions.

*B. Williams Did Not Concede the Immateriality of ETE's Alleged Breaches*

ETE's second overarching argument is that Williams conceded that any possible breach ETE may have committed was not material, and thus cannot trigger the WPZ Termination Fee Reimbursement. On the Closing Date, Williams made itself available to consummate the Merger.[138] When the Merger nonetheless failed, it stated that it would have waived any of ETE's breaches under §§ 6.03(a)-(b) had ETE agreed to close.[139] Thus, according to ETE, because each of the provisions at

_____

Br., at 14. Nonetheless, following termination, ETE maintained its countersuit against Williams for performance failures completely unrelated to the 721 Opinion. That action tends to demonstrate that ETE understood the plain meaning of the survival clause and its intended operation.

[138] Clark Aff., Ex. 40, Declaration of Richard Hall, ¶¶ 3–4; Clark Aff., Ex. 41, at -1002872.

[139] Potts Aff., Ex. 24 (Letter from Williams General Counsel stating, "Williams was prepared yesterday to waive the failure of the conditions in Sections 6.03(a) and 6.03(b) and close, but in light of ETE's refusal to close and subsequent termination, Williams is now entitled to receive the WPZ Termination Fee Reimbursement."). I note that Williams' letter appears to reflect its belief that ETE's breaches excused Williams' performance under the Merger Agreement, suggesting

34

issue contain materiality qualifiers, as a matter of law, it cannot have been in breach of those provisions.

Faced with a material breach of a contract, a non-breaching party has two options: it may choose to cease performance, or it may continue performance of the contract.[140] Continuing performance waives the argument that the waiving party's performance obligation was discharged, but it does not waive recovery for the material breach.[141] By extension of this logic, the non-breaching party's continued performance does not admit or concede or conclusively establish that a breach was immaterial. ETE cites no case law for the proposition that a party's willingness to proceed with an agreement *must* mean that any violations did not matter to it.[142] And such a construction makes no sense as a matter of English usage. Merriam-Webster's first definition of "material" (in the sense obviously intended by the parties) is "being of real importance or consequence – SUBSTANTIAL."[143] This

---

Williams had a contemporaneous belief that such alleged breaches were material. I need not make a finding on this issue at this time.

[140] 14 Williston on Contracts § 43:15 (4th ed.). This principle of contract law has been cited approvingly by this Court in *In re Mobilactive Media, LLC*, 2013 WL 297950, at \*14 (Del. Ch. Jan. 25, 2013).

[141] 14 Williston on Contracts § 43:15 (4th ed.) ("While the acceptance of the defective performance operates to waive the right to declare that the material breach discharged the obligor from further performance, it does not waive the right to obtain damages for the breach.").

[142] *See* Defs.' and Countercl. Pls.' Response to Pl.'s Mot. for Partial Summ. J., D.I. 480 ("ETE Answering Br."), at 42–44.

[143] *Material*, *Webster's 3d Third New International Dictionary* (1961) (capitalization in original).

comports, for instance, with our jurisprudence in the realm of disclosure by a company to its stockholders: information of substantial importance must be disclosed regardless of whether it would necessarily change the vote of a stockholder on the issue presented.[144] A contractual breach may be "substantial" to a counterparty without necessarily causing that counterparty to conclude that the consummation of the contract is against its interests as a result. What is material is a matter of context.[145]

Cast correctly, ETE's argument is really a factual one: did Williams' perfervid desire to proceed despite the alleged breaches indicate that it found ETE's alleged violations immaterial? I need not resolve this question at this juncture: this factual argument will resurface later. Having addressed ETE's two overarching arguments and rejected them, I now turn to the four specific allegations of breach by which

---

[144] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018), (finding that a "fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' But, to be sure, this materiality test 'does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.'" (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985))); *see also City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 2020 WL 3529586 (Del. June 30, 2020) (holding that materiality in the context of information owed by a director to her board includes information "relevant and of a magnitude to be important" to the board's determination) (internal citations omitted).

[145] This is a general discussion on materiality as it relates to ETE's overarching argument here. The Merger Agreement specifically defines several different materiality qualifiers, and these are discussed separately below. Nothing here precludes any party from arguing a particular meaning of "material" in context.

36

Williams seeks to recover the WPZ Termination Fee Reimbursement and other damages.

*C. The Best Efforts Clauses*

ETE (but not Williams) has moved for summary judgment as to whether it breached its obligations under § 5.03 and § 5.07 to use its best efforts to close the Merger, as alleged in Count I of Williams' Amended Complaint. ETE argues that its best efforts are now law of the case, based on my 2016 trial opinion (the "2016 Trial Opinion"). In that opinion, I stated:

> There is simply nothing that indicates to me that [ETE] has manipulated the knowledge or ability of Latham to render the 721 Opinion, or failed to fully inform Latham, or do anything else, whether or not commercially reasonable, to obstruct Latham's issuance of the condition-precedent 721 Opinion, or that had a material effect on Latham's decision. Therefore, I have no basis to find that [ETE] is in material breach of the commercially reasonable efforts requirement. . .[146]

In affirming the 2016 Trial Opinion, the Supreme Court found, "ETE did meet its burden of proving that any alleged breach of covenant did not materially contribute to the failure of the [721 Opinion]."[147] In other words, ETE successfully proved it did not *cause* the failure of the 721 Opinion. ETE argues that Williams is foreclosed

---

[146] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *17 (Del. Ch. June 24, 2016).

[147] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 268 (Del. 2017).

by the law of the case from continuing to litigate best efforts issues. For two reasons discussed below, I disagree. Disputes of material fact remain.

*First*, my analysis in the 2016 Trial Opinion focused exclusively on § 5.07(b).[148] That provision required both parties to "each use its commercially reasonable efforts to obtain the Tax opinion[] described in Section[] 6.01(h)," *i.e.*, the 721 Opinion.[149] As described, I found that ETE was not in breach of § 5.07(b) because it had taken no affirmative actions preventing Latham from issuing the 721 Opinion and there were no "actions available to [ETE] that would have caused Latham, acting in good faith, to issue the 721 Opinion."[150] This is the finding that ETE relies on as law of the case. But § 5.07(b) is not the only efforts clause. There is the general "Reasonable Best Efforts" clause in § 5.03(a), which requires each party to "use its reasonable best efforts to . . . take . . . all actions . . . to consummate and make effective in the most expeditious manner practicable, the Transactions. . ."[151] Then, there is the more specific tax-related efforts clause in § 5.07(a), requiring each party to "use its commercially reasonable efforts to cause (i) the Merger to

---

[148] *See Williams Cos.*, 2016 WL 3576682, at *16. In my analysis, I found that ETE "was contractually obligated to use commercially reasonable efforts to obtain the 721 Opinion from Latham," and I cited to § 5.07(b). I continued, "Williams argues that [ETE] is in material breach of *that contractual provision*." *Id.* (emphasis added).

[149] *See id.* at *16–17; Merger Agreement, § 5.07(b).

[150] *Williams Cos.*, 2016 WL 3576682, at *16–17.

[151] Merger Agreement, § 5.03(a).

qualify for the Intended Tax Treatment," *i.e.*, to be tax-free.[152] These efforts clauses implicate issues of material fact not resolved by my findings in the 2016 Trial Opinion, which focused on ETE's actions related to Latham's inability to issue the 721 Opinion. Here, additional questions are at issue.[153]

*Second*, and more fundamentally, the Supreme Court, while affirming the ruling permitting termination, *disagreed* with my analysis of ETE's best efforts, writing, "covenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction."[154] The Supreme Court found that the language in the best efforts covenants "not only prohibited the parties from preventing the merger, but obligated the parties to take all reasonable actions to complete the merger."[155] Because my finding that ETE did not cause the condition precedent to fail was itself sufficient for the Supreme Court to affirm, it did so. However, the Court stated that my focus on the *absence* of affirmative Merger-scuttling acts by ETE to find compliance with best efforts was in error and noted that "[t]here was evidence, recognized by the Court of Chancery,

---

[152] *Id.* § 5.07(a).

[153] Williams points to new evidence casting doubt on who at ETE in fact discovered the issue with the 721 Opinion and to what extent ETE's *laissez-faire* approach actively prevented the parties from finding a solution. *E.g.*, Shen Aff., Ex. 82, Dep. of Darryl A. Krebs dated Oct. 25, 2018, at 97:6–98:18, 100:7–102:8; Shen Aff., Ex. 87, Dep. of T. Eiko Stange dated Oct. 26, 2018, at 105:22–106:6, 109:11–112:18, 120:6–23, 128:5–15, 204:10–15, 233:21–234:8.

[154] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017).

[155] *Id.* at 273.

from which it could have concluded that ETE did breach its [efforts] covenants. . .".[156] This referred to my finding that ETE "generally did not act like an enthusiastic partner in pursuit of consummation of the [Merger Agreement]."[157] I confirmed to the parties in August 2017 that a potential breach by ETE of the efforts clauses was a "live" issue due to the Supreme Court's commentary.[158]

Based on the foregoing, I deny ETE's Motion for Summary Judgment on this issue.[159] Disputes of material fact remain as to whether ETE's approach to consummating the Merger fulfilled its contractual duties.

*D. The Tax Representation Clause*

Williams and ETE have cross-moved for summary judgment as to whether ETE was in breach of its tax representation obligations as of the Merger termination, triggering liability for the WPZ Termination Fee. To recapitulate, where, as here, a party has withdrawn from the Merger due to the passing of the Outside Date, ETE is liable to Williams for the WPZ Termination Fee Reimbursement if, but only if, any of several enumerated "conditions" remain "[un]satisfied."[160] Included among

---

[156] *Id.*

[157] *Williams Cos.*, 2016 WL 3576682, at *17.

[158] *See* Tr. of Aug. 29, 2017 Telephonic Status Conference, D.I. 287, at 4:2–23.

[159] Accordingly, Count I of Williams' Amended Complaint, which addresses the best efforts clauses, remains for trial. I note that ETE's Counterclaim regarding *Williams'* alleged failure to use its best efforts also remains.

[160] Merger Agreement, § 5.06(f).

such conditions are those "set forth" in §§ 6.03(a) and (b).[161]   Section 6.03(a)

provides one such condition: that certain representations and warranties shall be true

as of the Closing Date.   The Section, at 6.03(a)(i)-(iii), enumerates several

representations which, if false[162] as of closing, excuse performance.  With respect to

non-enumerated representations and warranties, § 6.03(a)(iv) imposes the following

condition:

> each of the other representations and warranties of [ETE not
> enumerated in §§ 6.03(a)(i)-(iii)] set forth in this Agreement shall be
> true and correct . . . as of the Closing Date [June 28, 2016] as though
> made on such date . . . except . . . where the failure of such
> representations and warranties to be so true and correct would not
> reasonably be expected to have, individually or in the aggregate, a
> Parent Material Adverse Effect."[163]

One such un-enumerated representation and warranty subject to § 6.03(a)(iv)

is set out in § 3.02(n)(i), where the parties represent that they do not "know[] of the

existence of any fact that would reasonably be expected to prevent (A) the Merger

from qualifying for the Intended Tax Treatment or (B) the Contribution and Parent

Class E Issuance from qualifying as an exchange to which Section 721(a) of the

---

[161] *Id.* § 6.03.

[162] The falsehood of these enumerated representations is qualified by its materiality: § 6.03(a)(i) must be "true and correct . . . except for any immaterial inaccuracies," (ii) must be "true and correct in all material respects," and (iii) must simply be true and correct.  *Id.* §§ 6.03(a)(i)-(iii).

[163] *Id.* § 6.03(a)(iv).

41

Code applies."[164] That condition remained unsatisfied as of the Closing Date and at the time ETE terminated the Merger Agreement.

As ETE points out, in the 2016 Trial Opinion, I noted that the purpose of ETE's tax representation as of the time of signing was "that all sides can be fully informed as of the time the agreement is reached. There are no facts here that [ETE] failed to disclose. Both [ETE] and Williams understood all the facts at issue."[165] I found that Latham's future analysis of the transaction—which gave rise to its inability to issue the 721 Opinion—was not a "fact," and thus that ETE had not breached it tax representation as of the time of signing.[166] However, under § 6.03(a)(iv), a condition of the Merger is that such representations must also be "true and correct . . . as though made on" the Closing Date, which the parties agreed would be June 28, 2016. As of that date, ETE was aware of facts that "would reasonably be expected to prevent" the equity component of the deal from qualifying under Section 721(a): The value of the unit equity component of the Merger consideration had shrunk, and its own tax advisor, Latham, had informed ETE that it could *not* certify that the deal qualified under Section 721(a). Knowing these facts, ETE, as

---

[164] *Id.* § 3.02(n)(i).

[165] *Williams Cos.*, 2016 WL 3576682, at *18.

[166] *Id.* at *19.

of the Closing Date, could not make a representation, truthfully, consistent with § 3.02(n)(i).

However, the tax representation just referred to is not among those enumerated in §§ 6.03(a)(i)-(iii); a failure of such a representation, under § 6.03(a)(iv), shall be considered a condition excluding merger obligations—and a trigger to liability for the WPZ Termination Fee Reimbursement—*only* where the failure[167] could reasonably be expected to cause a "Parent Material Adverse Effect." The Merger Agreement defines Parent Material Adverse Effect as follows:

> "Parent Material Adverse Effect" means any change, effect, event, occurrence, circumstance, development or state of facts that, with all other changes, effects, events, occurrences, circumstances, developments and states of fact, is or would reasonably be expected to be materially adverse to the business, financial condition or results of operations of Parent and its Subsidiaries, taken as a whole, other than any change, effect, event, occurrence, circumstance, development or state of facts to the extent relating to (i) the economy in general, (ii) the Energy Product gathering, processing, treating, transportation, storage and marketing industries generally or related products and services . . . (viii) the announcement of this Agreement or the Transactions or the consummation of the Transactions . . . provided, however, that the changes, effect, events, occurrences, circumstances, developments or states of facts set forth in the foregoing clauses . . . shall be taken into account in determining whether a "Parent Material Adverse Effect" has occurred to the extent such changes, effects, events, occurrences, circumstances, developments or states of facts have a disproportionate effect on Parent and its Subsidiaries, taken as a whole, when compared

---

[167] Considering such failure "individually or in the aggregate. . ." Merger Agreement, § 6.03(a)(iv).

to other participants in the industries in which Parent and its Subsidiaries operate.[168]

The question of whether the failure of the tax representation amounted to such a Parent Material Adverse Effect is intensely factual, and should, to my mind, be based on a trial record.

*E. The "Ordinary Course" Operating Covenant Provisions*

Williams and ETE have cross-moved for summary judgment regarding whether ETE breached its operating covenants. The WPZ Termination Fee Reimbursement obligation is triggered by a failure of "conditions" including those in § 6.03(b) of the Merger Agreement. In that section, ETE agreed that it "shall have, in all material respects, performed or complied with all obligations required by the time of the Closing to be performed or complied with by it under this Agreement. . ."[169] Lack of compliance (absent affirmative defenses) would trigger ETE's obligation to pay Williams the WPZ Termination Fee Reimbursement.

Section 6.03(b) required ETE, among other things, to abide by its "Covenants Relating to Conduct of Business" under § 4.01(b). Section 4.01(b) requires that "Except as set forth in Section 4.01(b) of the Parent Disclosure Letter," ETE "shall . . . carry on its business in the ordinary course. . ."[170] Section 4.01(b) also contains

---

[168] *Id.* § 8.03, *Parent Material Adverse Effect*.

[169] *Id.* § 6.03(b).

[170] *Id.* § 4.01(b).

several subsections with more specific operating covenants. Williams asserts that as a result of the Preferred Offering, ETE breached its operating covenants in four ways, each relating to the Preferred Offering.

*First*, Williams argues that ETE breached its general obligation in § 4.01(b) to operate "in the ordinary course." It bases its argument on my finding in another matter, *In re Energy Transfer Equity, L.P. Unitholder Litig.*,[171] later affirmed by the Supreme Court, that the Preferred Offering breached ETE's limited partnership agreement.[172] Based on the testimony of ETE's own personnel, breaching its limited partnership agreement is not "ordinary course" for the company.[173]

*Second*, § 4.01(b)(ii) provides that ETE would not "take any action that would result in [ETE] . . . becoming subject to any restriction not in existence on the date hereof with respect to the payment of distributions or dividends[.]"[174] The Preferred Offering required ETE to make distributions to the participating preferred unitholders regardless of distributions to the common unitholders.[175]

---

[171] 2018 WL 2254706 (Del. Ch. May 17, 2018), *aff'd sub nom. Levine v. Energy Transfer L.P.*, 223 A.3d 97 (Del. 2019).

[172] *See id.* at *25.

[173] *E.g.*, Clark Aff., Ex. 15, Dep. of Kelcy Warren dated December 4, 2019, at 97:9–12; Clark Aff., Ex. 25, Dep. of McReynolds dated Oct. 8, 2019, at 189:7–10.

[174] Merger Agreement, § 4.01(b)(ii).

[175] *See* Clark Aff., Ex. 45, at -199855.

*Third*, § 4.01(b)(iii) provides that ETE would not "split, combine or reclassify any of its equity securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for equity securities. . ."[176] Through the Preferred Offering, ETE issued one preferred unit for each participating common unit, and thus, Williams contends, issued "securities in respect of . . . equity securities."[177]

*Fourth*, in § 4.01(b)(vi), ETE represented it would not "amend (A) the organizational documents of [ETC, or] (B) the [ETE] Certificate of Partnership or the Partnership Agreement. . ."[178] To make the Preferred Offering, ETE amended its limited partnership agreement.[179]

ETE does not dispute any of the facts cited above regarding the Preferred Offering and its effect with regard to the operating covenants. Simply put, the Preferred Offering did not comport with the requirements set forth in the operating covenants. ETE raises two arguments as to why the Preferred Offering nonetheless did not cause it to breach these operating covenants. The first is that any violations of the operating covenants were immaterial, and that the Merger Agreement does

---

[176] Merger Agreement, § 4.01(b)(iii).

[177] Clark Aff., Ex. 25, Dep. of McReynolds dated October 8, 2019, at 202:11–14.

[178] Merger Agreement, § 4.01(b)(vi).

[179] *See* Clark Aff., Ex. 46, at 1; *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *4 (Del. Ch. June 24, 2016).

not prohibit immaterial noncompliance with the operating covenants. ETE's second argument is that the Merger Agreement was explicitly modified by another agreement, the Parent Disclosure Letter, which specifically authorized "issuances of equity securities with a value of up to $1.0 billion" notwithstanding the prohibition on equity issuances in the Merger Agreement. The Preferred Offering was an issuance of just under $1 billion. ETE reasons that, to the extent that any acts undertaken in connection with the Preferred Offering are in apparent material violation of the operating covenants, therefore, those covenants are overridden by the equity-issuance carve-out in the Parent Disclosure Letter.

I discuss each in turn.

### 1. Materiality Qualifiers in the Operating Covenants

ETE argues that if it violated any operating covenants, it did not do so in a way material to Williams. Under § 6.03(b), ETE agreed that it "shall have, *in all material respects*, performed or complied with all [operating covenants]."[180] This provision covers the performance obligations detailed in § 4.01(b). ETE argues that the Preferred Offering—which is the source of the alleged violations—would have had no serious effect on Williams, and, further, that Williams knew about it and was nonetheless eager to close. The parties disagree about the meaning of "in all material

---

[180] Merger Agreement, § 6.03(b) (emphasis added).

47

respects," a disagreement I need not address here, because applying any standard awaits resolution of issues of fact.

The parties contest what effect the Preferred Offering actually would have had on Williams, and thus whether the violations it represented were material. The factual nature of this issue is complicated by the way events transpired. The Merger failed to close, and so Williams' stockholders were never subjected to the effects of the Preferred Offering. Moreover, the market rebounded, and so even ETE common units were not subjected to the effects of the Preferred Offering.[181] As a result, neither party can point to a concrete effect to demonstrate its materiality or immateriality as a matter of law. Williams cites to ETE's financial advisors, who noted that if ETE had cut distributions as it anticipated would be required, the Preferred Offering would "represent a wealth transfer from non-participating to participating units."[182] Williams asserts that the Preferred Offering would have created a price differential that would devalue and dilute the Williams stockholders.[183] ETE argues that Williams' willingness to close is the strongest kind

---

[181] *See In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at *14 (Del. Ch. May 17, 2018) ("ETE ended up not cutting distributions: About a month after the merger was terminated, ETE announced that its distributions to common unitholders would stay flat at $0.285 per unit. On October 26, 2017, ETE announced that it would increase its quarterly distributions to $0.295 per common unit.") (internal citations and footnotes omitted).

[182] Clark Aff., Ex. 55, at -6114.

[183] *See* Clark Aff., Ex. 13, at -011.

of evidence that the Preferred Offering was not material. Addressing the issue, to my mind, requires a trial record.

### 2. The Parent Disclosure Letter

ETE argues that even if its actions in connection with the Preferred Offering appear to be in material violation of its operating covenants, any such violation is excused under the terms of the Parent Disclosure Letter. That document, incorporated into the Merger Agreement, per ETE contains a carve-out that permits the Preferred Offering. In general, the Parent Disclosure Letter provides disclosures and permits ETE to take enumerated actions otherwise *explicitly* prohibited by the Merger Agreement. Section 4.01(b)(v)(1) of the Parent Disclosure Letter provides, "[ETE] may make issuances of equity securities with a value of up to $1.0 billion in the aggregate."[184] ETE argues that because the Preferred Offering has a maximum potential value underneath the $1 billion ceiling, the offering was permitted, regardless of whether it otherwise violated any operating covenant.[185]

The relationship between the Parent Disclosure Letter and the Merger Agreement is, both parties agree, a matter of contract interpretation. It is clear that the agreement between the parties was that ETE was prohibited by § 4.01(b)(v) from issuing new equity, per the Merger Agreement, but that such prohibition was

---

[184] Parent Disclosure Letter, § 4.01(b)(v)(1).

[185] *See* ETE Opening Br., at 24–29; *see also* Potts Aff., Ex. 21, at 2 (noting maximum value of $942,508,720 for the Preferred Offering).

overridden by the specific permission incorporated into the Merger Agreement via the Parent Disclosure Letter. What is less clear is to what extent that permission also overrode the four operating conditions cited by Williams here.

The parties address at great length in briefing the interplay between the various sections of the Parent Disclosure Letter and the Merger Agreement in way of the operating-condition covenants. To my mind, at this stage, the effort is misdirected. Trial in this matter will create a factual record, informing me of the potential effect on Williams of any breaches of the covenants inherent in the Preferred Offering. To the extent I find any nominal breaches to be material under the meaning of that term in the Merger Agreement, I must then evaluate whether those nominal breaches are nonetheless permitted under the equity issuance provision in the Parent Disclosure Letter. Addressing the latter issue in the abstract risks an advisory opinion, and I decline to do so here.

\*\*\*

Based on the foregoing, I deny the parties' cross-motions for summary judgment regarding ETE's alleged violations of the operating covenants.

*F. The Capital Structure Representation Clause*

Williams and ETE have cross-moved for summary judgment regarding whether ETE breached its representation regarding its capital structure. Under § 6.03(a) of the Merger Agreement, ETE agreed that "[t]he representations and

warranties of [ETC] and [ETE] set forth in Sections 3.02(c)(i) and 3.02(c)(ii) (Capital Structure) shall be true and correct as of the Closing Date as though made on such date . . . except for any immaterial inaccuracies. . . ."[186] In § 3.02(c)(i), ETE represented that as of the signing date, it had three classes of equity, as well as a specific number of shares in each class:

> The authorized equity interests of Parent consist of common units representing limited partner interests in Parent ("Parent Common Units"), Class D Units representing limited partner interests in Parent ("Parent Class D Units") and a general partner interest in Parent ("Parent General Partner Interest"). At the close of business on September 25, 2015 (the "Parent Capitalization Date"), (i) 1,044,764,836 Parent Common Units were issued and outstanding, of which 5,776,462 consisted of Parent Restricted Units, (ii) 2,156,000 Parent Class D Units were issued and outstanding and (iii) there was an approximate 0.2576% Parent General Partner Interest.[187]

The bring-down clause in § 6.03(a) meant that ETE's representation regarding the number of classes of equity was made on both the signing and the Closing Date.[188]

It is undisputed that the Preferred Offering created a fourth class of equity.[189]

Thus, at the Closing Date, ETE could no longer represent that the three-class equity

---

[186] Merger Agreement, §6.03(a)(i).

[187] *Id.* § 3.02(c)(i).

[188] *Id.* §6.03(a)(i). However, as Williams points out, the representations regarding the *number* of shares in each equity class was only represented to be accurate as of the signing date. *See id.* § 3.02(c)(i) (representing number of shares only "[a]t the close of business *on September 25, 2015*") (emphasis added). I agree that this suggests the parties intended to permit the number of shares to change, but not the number of classes of shares (subject, of course, to exceptions in the Parent Disclosure Letter).

[189] Clark Aff., Ex. 45, at -199834; Clark Aff., Ex. 46, at 1; Clark Aff., Ex. 47, at F-7 through F-8.

structure described in § 3.02(c)(i) was accurate. The language providing the materiality standard for the capital structure representation differs from that of the operating covenants. It requires that ETE's representations be true as of the Closing Date "except for any immaterial inaccuracies."[190] Williams argues that "immaterial inaccuracies" here is limited to a "de minimis" breach—essentially, a small error as to the accuracy of the number of shares.[191]

ETE offers the same counterarguments regarding the capital structure representation as it offered for the operating covenants. First, it argues that a new class of equity is an immaterial inaccuracy. Second, it argues that the Parent Disclosure Letter permits the change. The same reasons underlying my denial of summary judgment regarding the operating covenants apply here. I require a trial record to resolve these disputes. Based on the foregoing, I deny the parties' cross-motions for summary judgment regarding ETE's alleged violations of its capital structure representations.

### G. ETE's Affirmative Defenses and Motion for Sanctions

As noted, ETE has brought counterclaims for breach of contract and declaratory judgment. It also asserts affirmative defenses based on several issues in those counterclaims, including that Williams failed to substantially comply with the

---

[190] Merger Agreement, §6.03(a)(i).

[191] Williams Opening Br., at 30–31.

52

Merger Agreement, that Williams has unclean hands, and that even if ETE's Preferred Offering violated the Merger Agreement, it was Williams' wrongful refusal to consent to the Public Offering that caused that breach. Having denied Williams' requested relief at this stage, I need not address these affirmative defenses at this time.

More than two months after arguing the cross-motions for summary judgment, ETE filed a Motion for Sanctions against Williams. The Motion for Sanctions brings allegations of litigation misconduct, chiefly against Williams' CEO Armstrong, conduct that ETE wishes to impute to Williams. After review, I find that the Motion for Sanctions will not alter the outcome of the cross-motions for summary judgment at issue here, and that the allegations should be dealt with at trial or a separate evidentiary hearing.

## IV. CONCLUSION

Based on the foregoing, the parties' cross-motions for summary judgment are denied except with respect to the contractual issues resolved here. The parties should confer and submit a form of order consistent with this Memorandum Opinion.

53